IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **WESTBROOK MONSTER MIX COMPANY, LLC, ET AL.** : | |
| : | |
| **v.** : | **CIVIL ACTION NO. 23-2952** |
| : | |
| **EASY GARDENER PRODUCTS, INC.** : | |

McHUGH, J.                                                                                           February 27, 2024

# MEMORANDUM

In 2020 and 2022, Plaintiffs Westbrook Monster Mix Company, LLC, and John Martin, CEO and President of Monster Mix, entered into license agreements with Defendant Easy Gardener Products, Inc. ECF 14 ¶¶ 15-17, 38-39 (Am. Compl.). Shortly thereafter, Defendant sought to terminate the license agreements. *Id.* ¶¶ 45-46. Plaintiffs filed the present action, asserting breach of contract (Count I), fraud (Count III), and Lanham Act violations (Count IV), and seeking declaratory relief (Count II). Before me now is Defendant's Motion to Dismiss all claims, except for breach of contract. ECF 17 (Mot. to Dismiss). Because the requested declaratory relief duplicates the breach of contract claim, I will grant dismissal as to Count II.[1] I will also partially grant dismissal as to Plaintiffs' allegations of fraud under a theory of good faith and fair dealing, but I will allow Count III to proceed because further discovery could ascertain the falsity of at least some of the alleged statements. I will allow the Lanham Act allegations (Count IV) to proceed, as well.

---

[1] In Count I, Plaintiffs allege breach of the parties' license agreements. Am. Compl. ¶¶ 54-66. In Count II, they request "an Order declaring that Plaintiffs did not breach the License Agreement, but rather Defendant's attempt to terminate the License Agreement was improper and ineffective." *Id.* ¶ 74. I conclude that Plaintiffs' declaratory relief would lack utility and be duplicative of their contract claims. *See Butta v. GEICO Cas. Co.*, 400 F. Supp. 3d 225, 233 (E.D. Pa. 2019) (Kearney, J.) (holding that a similar request for declaratory relief merely "translate[d] into seeking declaratory judgment on [the defendant's] affirmative defense").

I.  **Relevant Factual Background**[2]

In 2015, Plaintiffs formulated and commercialized a blend of supplemental deer feed used to promote antler growth. Am. Compl. ¶ 9; Am. Compl. Ex. A at Attach. A (trademark registration). Plaintiffs registered their product under the mark "Westbrook Monster." Am. Compl. ¶ 10. As Plaintiffs recount, their product saw rapid success and profitability, prompting Defendant to lobby them for an exclusive license. *Id.* ¶¶ 11-13.

In November 2020, the parties entered into a license agreement, granting Defendant exclusive use of the product's formulas, brand name, and brand logos, in exchange for minimum royalties. *Id.* ¶¶ 15-16. Despite Defendant receiving several customer complaints, Plaintiffs assert that it repeatedly dismissed any concerns and stated that the product's sales and marketing were positive. *Id.* ¶¶ 28-32. In January 2022, the parties entered into an amended license agreement, whereby Plaintiff Martin accepted employment with Defendant in lieu of the minimum royalties. *Id.* ¶¶ 38-39. During his employment, Plaintiffs allege, Mr. Martin discovered problems with the product being sold. *Id.* ¶¶ 43-44. And shortly thereafter, Defendant sought to stop selling the product and terminate the license agreements. *Id.* ¶ 46.

II.  **Discussion**

   A.  *Fraud (Count III)*

Plaintiffs premise their allegations of fraud under two theories. First, Plaintiffs allege that Defendant is liable for fraud because it violated its "common law duty" of good faith and fair dealing. Am. Compl. ¶¶ 80-82. Second, Plaintiffs allege Defendant fraudulently concealed its breach of the license agreement to prevent Plaintiffs from declaring a breach and induce them into accepting an amended license agreement. *Id.* ¶¶ 93-96. I address each theory in turn.

---

[2] This is Defendant's second motion to dismiss. Its first motion, ECF 9, became moot when Plaintiffs filed their first Amended Complaint, ECF 16.

### *i.      Good faith and fair dealing*

Plaintiffs cannot rely on a tort duty of good faith and fair dealing because they fail to sufficiently plead the existence of a "special relationship" between the parties, which is necessary under both Texas and Pennsylvania law.[3]

Under Texas law, "a duty of good faith and fair dealing may arise as a result of a special relationship between the parties governed or created by a contract."[4] *Arnold v. Nat'l Cnty. Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987) (citation omitted). The tort duty proceeds from either (1) a formal fiduciary relationship or (2) a special or confidential relationship. *Hux v. S. Methodist Univ.*, 819 F.3d 776, 781-82 (5th Cir. 2016) (citation omitted). The special or confidential relationship is generally "earmarked by specific characteristics including: long standing relations, an imbalance of bargaining power, and significant trust and confidence shared by the parties." *Id.* at 781. As the Fifth Circuit has noted, Texas courts find these relationships exist "in an extremely narrow class of cases." *Id.* In fact, Texas Courts of Appeals "recognize only one special relationship – that between an insurer and an insured," but have refused to impose it to employer-employee, supplier-distributor, and franchisor-franchisee relationships, among others. *Id.* at 781-82.

Pennsylvania courts "generally treat a breach of [good faith and fair dealing] as a breach of contract action." *Ash v. Cont'l Ins. Co.*, 932 A.2d 877, 883 (Pa. 2007). This duty is also limited to "special types of contracts involving special relationships between the parties." *Hopkins v. GNC*

---

[3] The parties' agreements contain governing law provisions selecting Texas law, but Defendant at this stage does not concede that Texas law applies. Mot. to Dismiss at 4 n.2. Plaintiffs are silent as to the governing law but point to both Texas and Pennsylvania law. ECF 18 (Pls.' Resp.). Plaintiffs' fraud allegations grounded in lack of good faith and fair dealing fail under either state's law.

[4] The parties' license agreements contain a duty to "deal with each other in good faith." *See, e.g.*, Am. Compl. Ex. A, ¶ 12.o.

*Franchising, Inc.*, No. 5-1510, 2006 WL 2266253, at *4 (W.D. Pa. Jan. 13, 2006). This includes franchisor-franchisee and insurer-insured, but not lender-borrower relationships. *Creeger Brick & Bldg. Supply Inc. v. Mid-State Bank & Tr. Co.*, 560 A.2d 151, 153 (Super. Ct. Pa. 1989).

Plaintiffs argue they "indisputably had a 'special relationship' with Defendant" to impose a duty of good faith and fair dealing because Defendant, as a "national corporation, enjoyed a position of significant power over the [Plaintiffs'] small business start-up." Pls.' Resp. at 9. But there are no allegations in the Amended Complaint which could give rise to a special relationship. As part of their fraud claim, Plaintiffs merely allege:

> In addition to the explicit terms of the License Agreement or Amended License Agreement, Defendant had a common law duty to deal with Plaintiffs with good faith and in fair dealing with respect to Plaintiff's proprietary Product that Plaintiffs, a small-business start-up, voluntarily licensed to Defendant, a national corporation, because of the special nature of the parties' relationship.

Am. Compl. ¶ 81. Even if they had alleged Defendant enjoyed "significant power" over Plaintiffs, this falls short of alleging a special relationship which could give rise to a tort duty of good faith and fair dealing, separate from Plaintiffs' breach of contract allegations.[5]

### ii. *Fraudulent misrepresentations and inducement*

Only statements that are capable of being evaluated as factually true or false can form the basis of a fraud claim, not mere "puffery" or expressions of opinion. Applying that standard here, I find that some of Plaintiffs' allegations suffice to prove fraud, as follows.

---

[5] Plaintiffs do not cite any case law where a licensor-licensee relationship like the one at issue here gives rise to a tort duty of good faith and fair dealing. *See* Pls.' Resp. at 8-10. Instead, Plaintiffs rely on several cases to argue that unequal bargaining power by itself may create a duty of good faith and fair dealing. *Id.* at 8. As Defendant points out, the cited authority pertains to relationships different from the one at issue here. *See, e.g.*, *In re Marriage of Braddock*, 64 S.W.3d 581, 583-84, 588 (Tex. App. 2001) (affirming a lower court's finding that a confidential relationship existed between former spouses); *Lovell v. W. Nat. Life Ins. Co.*, 754 S.W.2d 298 (Tex. App. 1988), *writ denied* (Nov. 30, 1988) (finding no special relationship as to the mortgagor-mortgagee parties). In any event, even if this authority supported a finding of a special relationship, the Amended Complaint lacks factual allegations to support one here.

Under Texas and Pennsylvania law, to establish fraud, a plaintiff must allege: (1) the defendant made a false, material representation; (2) the defendant knew the representation was false or made it recklessly as to whether it was true or false; (3) the defendant intended to mislead or induce the plaintiff to act upon or rely on its truth; and, (4) the plaintiff justifiably relied on the misrepresentation, resulting in injury. *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 496 (Tex. 2019); *Porreco v. Porreco*, 811 A.2d 566, 570 (Pa. 2002). Mere puffery or expressions of opinion, however, do not amount to representations for purposes of fraud. *Berkebile v. Brantly Helicopter Corp.*, 337 A.2d 893, 903 (Pa. 1975), *abrogated by Reott v. Asia Trend, Inc.*, 55 A.3d 1088 (Pa. 2012); *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337-38 (Tex. 2011).

According to Plaintiffs, Defendant made several statements, through its then-Senior VP Mark Otto, in response to Plaintiffs' inquiry about customer complaints and diminution in sales. Am. Comp. ¶ 84. These statements included:

> "I would recommend waiting to see the results I think you and your family will be pleased." (email from Mark Otto, dated December 14, 2020)
>
> "The same as are the other **_hundreds_** of stores that we are adding to grow your brand daily." (email from Mark Otto, dated January 13, 2021)
>
> "The company is fine and growing." (email from Mark Otto, dated November 16, 2021)
>
> "Just a couple of points right off the top John, Buck has been in contact with every person on your list and we have worked with them either through free product or adjusted pricing to give them a good price on their opening orders." (email from Mark Otto, dated November 16, 2021)

*Id.* ¶¶ 31-32. Plaintiffs further allege Defendant knew these statements were not true and were instead gross misrepresentations, "given that [Plaintiffs' product] sales were cut nearly in half, rather than increased, and that Defendant provided no evidence that [it] ever reached out to

Plaintiffs' former customers to repair the relationships, but nonetheless [Defendant] averred that [it] did so to obscure its own breach of the License Agreement." *Id.* ¶¶ 86-87.

In addition, Plaintiffs assert Defendant's employee, John Scheel, represented to Plaintiffs that their deer feed product was being formulated and mixed "'exactly as prescribed,' despite knowing that the flavoring then being used in the product was not the same flavoring as indicated by Plaintiffs." *Id.* ¶¶ 88-89 (referring to an email from John Scheel on January 9, 2022). According to Plaintiffs, Defendant was "calculated" in making the aforementioned "intentional misrepresentations" to induce Plaintiffs to refrain from declaring a breach of the initial agreement and to enter into an amended agreement. *Id.* ¶¶ 95-96.

Defendant contends that none of these statements can serve as a basis for Plaintiffs' fraud claim, advancing several arguments.

First, Defendant argues the first three statements are "squarely puffery." Mot. to Dismiss at 10. I agree that the statements from December 14, 2020, and November 16, 2021 ("The company is fine and growing."), are mere puffery or opinions, unable to form the basis for a fraud claim. In contrast, the January 13, 2021, representation of adding "hundreds of stores" to grow Plaintiffs' brand is a quantifiable statement, capable of expressing a true or false proposition. As such, I find this statement is not puffery or opinion and survives dismissal on this basis. The same is true for the statements of November 16, 2021, where Defendant claims contact with every person on Plaintiffs' customer list, and January 9, 2022, where Defendant maintains it formulated the deer feed "exactly as prescribed."

Second, Defendant argues all four statements made from 2020-2021 lack a factual basis from which to infer that the statements were false, or to infer that Defendant intentionally made the statement with knowledge of their falsity. Plaintiffs concede their inability to "evaluat[e] the

6

accuracy of Defendant's statements, especially as to the sales performance of the [deer feed product]." Am. Compl. ¶ 92. But Plaintiffs allege it was Defendant who prevented Plaintiffs from making such an evaluation by "fail[ing] to provide records required by the License Agreement." *Id.* As such, Plaintiffs now base their inference that Defendant made false statements i.e., not expanding to "hundreds of stores" or contacting "every person," on evidence that sales declined and Defendant withheld sales reports. *Id.* ¶¶ 86-87. Plaintiffs also plead their belief that Defendant made these statements to influence Plaintiffs' conduct to amend their license agreement, instead of declaring breach. *Id.* ¶¶ 95-96. At this juncture, this is sufficient.

Third, Defendant argues "there are no allegations by which the Court can infer that [Defendant's employee, John Scheel] acted with the requisite intent to induce reliance." Mot. to Dismiss at 11 (referring to the January 9, 2022, statement that the deer feed was formulated "exactly as prescribed"). I disagree. Under Federal Rule of Civil Procedure 9(b), "intent or other conditions of a person's mind may be alleged generally, however, the pleadings must allege sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind." *Hollander v. Etymotic Rsch., Inc.*, 726 F. Supp. 2d 543, 549 (E.D. Pa. 2010) (Tucker, J.) (citation and internal quotation omitted). Plaintiffs allege the following as to John Scheel:

> John Scheel was in direct contact with the manufacturer and therefore knew or should have known that the Product was not being made in accordance with the specifications provided by [Plaintiff] Martin, but nonetheless misrepresented that it was in order to obscure yet more breaches of the License Agreement and to induce Plaintiff to ignore Plaintiff's own concerns.

Am. Compl. ¶ 90. Based on these allegations, once again I find it is possible to infer that Defendant's employee had the requisite state of mind.

7

Fourth, Defendant argues Plaintiffs failed to allege justifiable reliance because there is no allegation that Plaintiffs ever communicated to Defendant they *would* declare a breach, and in the absence of such a threat Defendant had no incentive to lie.  Mot. to Dismiss at 11.  I am not persuaded by the contention that a sophisticated business entity such as Defendant, needed a communication from Plaintiffs to foresee a potential declaration of breach.[6]

In summary, I will allow Plaintiffs' fraud claims to proceed as to those statements capable of being proven true or false, to include the January 13, 2021, November 16, 2021 (contacting every person), and January 9, 2022, statements.

### B. *Lanham Act (Count IV)*

Plaintiffs' Lanham Act claims establish a cause of action separate from breach of contract and may proceed.

"While much of the Lanham Act addresses the registration, use, and infringement of trademarks and related marks, [15 U.S.C. § 1125(a)] is one of the few provisions that goes beyond trademark protection."  *Lanham Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28-29 (2003).  Section 1125(a)(1) creates a federal remedy against those who falsely advertise or associate their products with others, be it through false or misleading descriptions, statements of fact, or "designations of origin."[7]  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572

---

[6] Defendant also seeks to introduce Plaintiff Martin's conditional employment offer, which stated: "no verbal or written agreements, promises or representations that are not specifically stated in this offer, are or will be binding upon [Defendant]."  Mot. to Dismiss at 11-12 (referencing Am. Compl. Ex. C).  According to Defendant, this language contradicts Plaintiffs' reliance allegations.  For purposes of dismissal at this stage, I view this clause in the employment agreement as unrelated to the terms of the license agreements at the center of this case.

[7] 15 U.S.C. § 1125(a)(1) reads as follows:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

U.S. 118, 122 (2014) (referring to subsections (A) and (B) of Section 1125(a)(1) as "distinct bases of liability": false association and false advertising, respectively).

Plaintiffs' Amended Complaint seems to allege both false association and false advertising by the Defendant.[8] Defendant seeks to dismiss Plaintiffs' Lanham Act claim, arguing it is "nothing more than dressed up claims for breach of contract." Mot. to Dismiss at 12.

District courts have dismissed claims under the Lanham Act when the alleged breaches are "wholly unrelated to the trademark." *AAMCO Transmissions, Inc. v. Smith*, 756 F. Supp. 225, 226 (E.D. Pa. 1991) (finding no basis for a Lanham Act allegation where the plaintiff merely alleged a

---

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

[8] The Court presumes Plaintiffs bring forth claims under both sections of 15 U.S.C. § 1125(a)(1). Their Amended Complaint quotes, but does not cite, 15 U.S.C. § 1125(a)(1)(B), Am. Compl. ¶ 102, and alleges incorrect advertising, *id.* ¶ 104. At the same time, they assert Defendant "falsely associated" their product and attempted to "pass off" the incorrectly manufactured product as the original product. *Id.* ¶¶ 104-106; *see also Heartbrand Beef, Inc. v. Lobel's of N.Y., LLC*, No. 8-62, 2009 WL 311087, at *2 (S.D. Tex. Feb. 5, 2009) ("[A] false [association] case is very often one of 'passing off' . . . ."). In their Response, Plaintiffs also cite to 15 USC § 1114, which covers liability for infringement of a registered trademark. Pls.' Resp. at 13. But they otherwise characterize their Complaint as alleging "passing off," and the only case law they cite to applies § 1125(a). This ambiguity is not concerning, because § 1114 and § 1125(a)(1)(A) have identical standards. *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000) ("We measure federal trademark infringement, 15 U.S.C. § 1114, and federal unfair competition, 15 U.S.C. § 1125(a)(1)(A), by identical standards."). To prove either, a plaintiff must show "(1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion." *Id.* Moreover, to prove a § 1125(a)(1)(B) false advertising claim, a plaintiff must show: "1) that the defendant has made false or misleading statements as to his own product [or another's]; 2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) that the deception is material in that it is likely to influence purchasing decisions; 4) that the advertised goods traveled in interstate commerce; and 5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc." *Pernod Ricard USA, LLC v. Bacardi U.S.A.*, Inc., 653 F.3d 241, 248 (3d Cir. 2011).

failure to submit purchase orders and gross receipts pursuant to the franchise agreement).[9] But there is no steadfast rule that parties "cannot maintain both a Lanham Act claim and a claim for breach of contract if both are sufficiently alleged although based on overlapping facts." *Gen. Elec. Co. v. Feuz Mfg., Inc.*, No. 107-1008, 2008 WL 11355394, at *3 (N.D.N.Y. May 15, 2008) (maintaining both a Lanham Act claim asserting misrepresentations to customers and a contract claim alleging misuse of intellectual property).[10]

Instead, "the critical inquiry is ordinarily whether the allegations arise *under* the license/franchise agreement (such as a licensee failing to make all of the royalty payments or send required reports about sales), which is merely a contract dispute, or whether allegations concern conduct exceeding the scope of the license (such as a licensee using a mark beyond the period of time, geographic scope, or manner permitted by the agreement), which gives rise to federal causes of action for infringement/unfair competition." *Gosden v. ErazorBits, Inc.*, No. 2200075, 2023 WL 3078612, at *3 (D.N.J. Apr. 25, 2023) (citation omitted).

Under their Lanham Act allegations, Plaintiffs assert Defendant incorrectly manufactured the deer feed product and did not disclose the incorrect manufacturing in its advertising. Am. Compl. ¶ 104. Moreover, according to Plaintiffs, Defendant falsely associated the incorrect

---

[9] *See also Stancato v. Versace*, No. 94-4192, 1995 WL 437532, at *2-3 (S.D.N.Y. July 25, 1995) (holding that the plaintiffs' rights did not depend on the Lanham Act because the "real issue" in the case was whether the plaintiff or the defendant owned the licensing company at issue, which would depend on common law governing contracts and fraud); *Silverstar Enterprises, Inc. v. Aday*, 537 F. Supp. 236, 241-42 (S.D.N.Y. 1982) (finding the case was "essentially a contract dispute between an exclusive licensee and a licensor over the right to use the trademark"); *Plum Tree, Inc. v. Seligson*, 342 F. Supp. 1084, 1087 (E.D. Pa. 1972) ("This is not a case where [the] plaintiff alleges that its licensees used its mark in connection with the sale of unauthorized goods thereby producing customer confusion and infringing the mark . . . or one in which [the] plaintiff alleged that its licensees have defrauded customers by performing unnecessary services, thereby bringing the mark into disrepute.") (internal citations omitted).

[10] *See also Mapinfo Corp. v. Spatial Re-Eng'g Consultants*, No. 2-1008, 2004 WL 26350, at *4 (N.D.N.Y. Jan. 5, 2004) (noting "the fact that [the defendant] sold only genuine . . . products [did] not preclude an action for unauthorized use of . . . trademarks, or an action for unfair competition based on false statements to the public") (cleaned up).

product with the correct product's brand name. *Id.* ¶ 105; *see also id.* ¶ 106 (reframing it as Defendant attempted to "pass off" the incorrect product as the original). Plaintiffs also allege that "Defendant marketed out-of-date product, whether or not manufactured correctly, under [their product's] brand name." *Id.* ¶ 110. At the same time, "Defendant packaged the Product . . . in alternative packaging rather than under the Brand Name." *Id.* ¶ 111. Such conduct, if proven, could affect the reputation of the product in the marketplace, which I view as falling within the purview of the Lanham Act. Defendant is correct that the parties' agreements contain at least two clauses that could extend to these allegations, but as the exclusive licensee of the product, its actions can have broad impact in the marketplace. The fact that certain allegations may support both a common law and a statutory claim is not a basis for dismissal. And I attach no significance to where the allegations are set forth in the Amended Complaint, because the Lanham Act Count IV specifically incorporates by reference all the earlier allegations, a common device in pleading.[11] Finally, the remedies provided by the Lanham Act are broader and, in that respect, the actions are not duplicative.

Plaintiffs' claims under the Lanham Act may proceed.

### III. Conclusion

For the reasons set forth above, Defendant's Motion to Dismiss will be granted in part and denied in part. An appropriate Order follows.

    /s/ Gerald Austin McHugh
United States District Judge

---

[11] For example, in pleading breach of contract Plaintiffs allege that Defendant failed "to take reasonable measures to preserve the integrity, goodwill and reputation of the Product." Am. Compl. ¶ 60. As further evidence of breach, Plaintiffs allege that "Defendant, without the prior knowledge or consent of Plaintiffs, modified the flavor of the Product resulting in an inferior product and sold product that was out of date to customers." *Id.* ¶ 61.